COMAR OIL CO. et al. v. RICHTER.

No. 16728. Opinion Filed Oct. 18, 1927.

(Syllabus.)

1. **Landlord and Tenant — Contract Construed One Between Landowner and Cropper and not One of Tenancy.**

Where B. enters into a contract with R., a landowner, whereby the former shall help prepare the land, plant, cultivate and gather the crops on such land, and is to receive therefor, as compensation, a share of the crops so grown, and where the possession and control of the land and the supervision thereof remain in the owner, who lives upon said land, and who also aids in the cultivation of the crop and furnishes stock and equipment therefor, and where no general right of occupancy of said land or the control thereof is given to B., except in so far as may be necessary for the cultivation of the crop thereon, such arrangement does not create the relation of landlord and tenant, but B. becomes a cropper and his rights as such are to be determined by the law pertaining to employer and employee. or landowner and cropper.

2. **Same—Action by Landowner for Damages from Pollution of Waters—Cropper not Necessary Party.**

Under the circumstances enumerated in paragraph 1 above, B., the cropper, would

not be a necessary party to an action brought by R., the landowner, to recover damages to his growing and unmatured crop accruing by reason of the negligence of defendants in permitting salt water, crude oil, and base sediment to be discharged into a natural water course traversing said land, thus polluting the waters thereof and damaging the crop.

### 3. Same—Instructions as to Contributory Negligence.

In an action for damages for negligent destruction of plaintiff's crop and stock, where the defendants' answer does not allege that plaintiff's damage was due to his own neglect, and where, at the close of plaintiff's evidence, defendants demur thereto and stand upon their demurrer, it is not reversible error for the court to charge the jury that "it is the duty of a person, seeing himself damaged or about to be damaged, to use all reasonable efforts to prevent or minimize those damages," and to refuse an instruction to the effect that if they should find that some of the damage to plaintiff was due to his want of ordinary care, he could not recover any damage, which he, by the use of reasonable care, could have prevented, where the evidence of plaintiff does not disclose any negligence or want of care on his part.

### 4. Same—Judgment for Damages Sustained.

Evidence examined, and it is held that the same is sufficient to be submitted to a jury and to support the verdict and judgment thereon, and that no error was committed in overruling defendants' demurrers and motions to direct a verdict.

Commissioners' Opinion, Division No. 1.

Error from District Court, Kay County; Claude Duval, Judge.

Action by F. R. Richter against Comar Oil Company et al., as trustees of Oklahoma Oil Properties, for the recovery of damages to crops, etc. Judgment for plaintiff, and defendants appeal. Affirmed.

Redmond S. Cole, Ramsey, de Meules & Martin, Victor C. Mieher, H. S. Gurley, W. K. Moore, Felix Duvall, and Koerner, Fahey & Young, for plaintiffs in error.

Sargent & Ross, for defendants in error.

BENNETT, C. A civil action for the recovery of damages brought in the district court of Kay county by F. R. Richter against Comar Oil Company, a corporation, Amerada Petroleum Company, a corporation, Pennok Oil Company, a corporation, Blackwell Oil & Gas Company, a corporation, Marland Refining Company, a corporation, Gypsy Oil Company, a corporation, and C E. Wentz and J. G. McCaskey, as trustees of Oklahoma Oil Properties. This cause was tried to a jury and a verdict was rendered therein followed by a judgment of the court in favor of the plaintiff and against the defendants, who bring this cause here for review. The parties will be referred to as plaintiff and defendants as they were designated in the trial court.

The petition of plaintiff alleged that he owned in fee the northeast quarter of section 35, township 25 north, range 1 west. of the Indian Meridian, in Kay county, Okla., and that he owned a school lease on the northwest quarter of section 36, township 25 north, range 1 west of the Indian Meridian, in Kay county, Okla.: that said farms were in high state of cultivation, fenced and cross-fenced, and that the same were properly stocked with horses, cattle, hogs, etc, and that plaintiff was accustomed to reap from said premises profitable crops of wheat, hay, and other farm products. That there flows across said farm Bird's Nest creek, which enters said farm near the northwest corner and flows off said farm near the southeast corner, and that up to April. 1923. the said creek furnished plaintiff's farm for all purposes an abundance of fresh water. That the defendants are now, and have been since the early part of 1923. actively engaged in the production of oil and gas from certain leases owned by them situated above and to the west of plaintiff's farm and along the watershed which feeds Bird's Nest creek. A description of the several leases operated by the defendants is set out, and it is alleged that all of the same are within the drainage basin of said creek, and that all of the water flowing from the surface of said leases drains into said creek, and that the defendants in operating for and producing natural gas and crude oil have brought large quantities of oil, base sediment, and salt water to the surface, which they and each of them have carelessly and negligently allowed to collect on the respective leaseholds to be washed off or drained off into gullies, drains, ravines and branches, and thence into Bird's Nest creek, whereby the said creek became polluted and the water thereof was rendered unfit for man or beast, and that during the spring of 1923, the said stream overflowed its banks on several occasions due to excessive rains and large quantities of crude oil, base sediment and salt water, which the defendants had negligently allowed to become deposited on their lands, were swept down across the farm of plaintiff, destroying 80 acres of wheat, poisoning his horses and hogs and chickens which had access thereto, and causing the plaintiff other loss

and expense, all of which are set out in detail and on which account the plaintiff prays judgment.

Plaintiff alleges that he lost wheat on fee land of the value of $800; that his hogs were damaged to the amount of $136; that he had to remove his cows from the farm at a cost of $45; that he lost two horses by death, $225; and damage to his 27 other horses amounting to $500; damage to his chickens $120; 15 acres of grass, $150; extra labor in caring for his stock, $200; and also 100 acres of wheat on his school lease, $1,000; and the destruction of 100 acres of stubble, $200.

Separate answers were filed by the several defendants. The answer of the Amerada Petroleum Company is perhaps typical of the answers filed. It consists of, first, a general denial, and admits that it holds a lease on the lands described as under lease by said defendant in the plaintiff's petition, and alleges that none of the other defendants have any interest in the said lease, and that said defendant operates, separately and apart, its own lease without interest or participation by the other defendants; alleges that there is a defect of parties and a misjoinder of causes of action in plaintiff's petition and denies that it operated its lease in a negligent or wrongful manner.

F. R. Richter, plaintiff, testified in substance that he had 125 acres of land in cultivation on his homestead, the balance being in pasture and grass, except a few acres for pump station operated by an oil company; that Bird's Nest creek traverses his farm from northwest to southeast, and that prior to the oil operations of defendants the water in the creek was good for all proper purposes, and that in 1923, in the spring, it became unfit for use, and there were two freshets by reason of which the creek overflowed its banks; the first was in early spring, the other in June, 1923; his wheat was then in the boot, and that the water spread over his wheat and while the water was still on the wheat it turned white and died. The water also covered 91 acres of wheat on his school land. This wheat was well along; that the wheat in these tracts which was not injured made about 16 bushels to the acre, and that which was overspread with water would have made the same if it had not been overflowed; that the wheat was worth $1 per bushel, and cost 21 cents per bushel to harvest, thresh and market. That he had 17 head of undeveloped shoats weighing 40 pounds in August, 1923, at the time suit was brought; that they should have weighed under normal conditions 140 pounds; their market value was 8 cents per pound. That he had 27 horses, and that the oil got on them and their hair peeled off, their limbs swelled, and they lost flesh and two of them died; that they had access to the creek; that they were in good condition before the flood. He says that the animals had what was known as oil field poisoning. The horses quit eating, got thin, and had running sores, and became practically worthless on the market, and that he sustained a loss of $75 per head. That he had to hire extra help to care for the stock, wiping the oil off them, and to keep them in the barn off the oil, and that the extra help was worth $50 per month for 3½ months.

Plaintiff was asked the following questions:

"Q. Do you know what caused that wheat to die? A. Yes. Q. What caused it to die? A. Oil and salt water. * * * Q. About how deep did the water get over the nine or ten acres? A. Probably four inches to six inches; it varied, shallower and deeper. Q. Now, how large was the wheat at the time this water went over? A. It seemed to be just heading out, probably in the boot. Q. In the boot, the latter part of April or the forepart of May?, A. Yes. Q. Now, did the water get over the top of the wheat at that time? A. No. Q. How long was the water over the ground, the nine or ten acres at that time? A. Probably a day. Q. Now, what was the condition of the water that went over that nine or ten acres of land? A. It was oily. Q. Mr. Richter, did you examine that nine or ten acres of land after the water had gone down? A. Yes. * * * Q. What was the condition of the wheat at that time, that is, after the water had gone off. When you went back out on the land to look at it, what condition did you find it? A. It had turned white. Q. How quickly after the water went off, was it that it, turned white? A. While the water was on was when I first noticed it: right in the water. Q. It turned white while the water was yet on it? A. Yes. Q. Well, did it die? Is that what you mean by saying it turned white? Is that what you mean to say? A. Yes, it died. Q. Now, did you notice any oil or substance on the wheat after the water went off of it, that nine or ten acres? A. Yes, oil."

This evidence had reference to the flood in April or May, 1923. Still later the following questions were asked:

"Q. Did you notice any foreign substance on the wheat that was overflowed by the first flood? After the water had gone down? A. Yes. Q. What did you find on it? A. Oil. Q. Now, what happened to this wheat, did anything happen to this

wheat after the water went off of it after the first flood? A. It died while the water was on."

With reference to the second flood in June, the witness testified:

"Q. About how many hours was it out over the wheat? A. Well, it ran across there, I suppose, about 36 hours, something like that. Q I mean, the wheat that was closest to the creek, now that that laid clear back upon the extreme limit of the flood, how long was the water over it? A. Not very long. Q. Well, about how long would you say, the number of hours? A. Probably an hour or so, or three hours; it would be hard to tell. * * * Q. Now, did anything happen to that wheat at the time it overflowed or immediately after? A. Yes. Q. What was that? A. It died. Q. When did you first notice it was beginning to die? A. While the water was on. Q. Now, Mr. Richter, did you go out in the wheat field and examine it after the water had gone off? A. Yes. Q. What did you find on the stalks of wheat, if anything? A. Oil Q. What did you do with the wheat that the water got over, the polluted water got over? A. Left it. Q. Did it develop at all? A. No, sir. Q. Did you have any income from it whatsoever? A. No, sir."

Eula Hackney, witness for plaintiff, testified that he was a farmer and owned land on Bird's Nest creek, and knew the effect of polluted water on vegetation. The following questions were asked:

"Q. Do you know, Mr. Hackney, what effect salt water—I believe you stated at the outset that Bird's Nest creek flowed through your farm? A. Yes. Q. Have you observed the general conditions up and down Bird's Nest creek? A. Yes. Q. Have you observed the effect that oil and salt water and other pollutive substances in Bird's Nest creek has upon vegetation? A. Yes. Q. Have you observed, or rather did you observe, the effect it had on vegetation that came in contact with it in the spring of 1923? A. Yes. Q. What did it do to it? A. It killed it."

Witness Blubaugh testified as follows:

"Q. Well, Mr. Blubaugh. isn't it a fact from your personal knowledge, that prior to the time when there was such a thing as the Tonkawa oil field, that wheat crops in the Bird's Nest bottom have been killed by overflow water? A. Small per cent. of it has. Q. What is that? A. Small per cent. of it Q. Have you ever been out over this Richter land where the wheat field was? A. Yes. Q. Do you know the character of the soil? A. Very well, yes. Q. Isn't it a fact that the soil is very level and will stay wet and damp if the sun don't reach it for a considerable period of time, poor drainage, in other words? A. Well, as long as the water don't stand on it, it will dry off as quick as any land, of course, there is a few low places where the water stands in it, that wouldn't dry off."

Mr. Hackney testified in substance that he has observed the effect the waters of Bird's Nest creek have, since they became polluted with oil and refuse, upon live stock; that he observed horses in and about the oil field that had been permitted to go to the water, and that it checks their hides, the hair comes off, and some of them are badly swollen and running sores are developed on their legs. This condition in the oil field is commonly termed "oil poisoning"; that is the name they give it when they become swollen and their hides check and they have running sores. He testifies further that he was in sections 2 and 3 in May, 1923, and that oil refuse was going off of all the leases along in this basin. The same with reference to sections 34 and 35. It would run off the leases and down into the drains and draws and into the road and into the creek; that it was plain to be seen, and that it runs into Bird's Nest creek. This was above the place where the creek runs through the plaintiff's farm. He says further that there are pollutive substances going off the southeast corner of the lease down into the natural drainage, and by gravity it flowed into Bird's Nest creek on the west side of and above the Richter farm. Remembers seeing the oil refuse from the Gypsy's lease in section 2. This refuse was running off the lease at the northeast corner and down the natural drain to Bird's Nest creek. This was also above and to the west of the Richter farm.

"Q. Mr. Hackney, have you made investigations subsequent to that time in this oil field? A. Yes, lots of them. Q. Had there been any or did you make any of those subsequent investigations prior to or before August 25, 1923? That is to say, went through the field any time between the May trip and the 25th of August, 1923? A. I was through the field along about the 1st of June, and then I was back through there, going back and forth to town to Tonkawa, going through the field several times after harvest, from about the 18th or 20th of June. Q. How about the conditions on your 1st of June trip? Were they the same as you had seen them in May? A. Yes, practically the same. * * * Q. You might describe what you saw on those subsequent trips? A. It would be the same as before. Always, as for instance, north of Three Sands, it drains out from the Pennock and the Comar on each side there, north of Three Sands. I have been through there numerous times last summer when the oil was running right down on each side of the road, right on down into Bird's Nest

creek. Mr. Cole: You don't mean last summer? You mean 1923? A. Yes."

Witness Wood testifies in substance as follows:

The oil and salt water has been continually running from that lease all the time ever since the first well was drilled in. No effort was made to stop it in any particular way.

"Q And the well was operated from January 17th up to and including, or rather was that well, operated and producing salt water and oil from January 17, 1923. up to and until August 25, 1923? Did that condition you speak of continue at all times during that time? A. Yes."

Cross-examination:

"Q. You say they made no effort to keep the stuff from running from the flow tanks? A. They made no effort to keep it from running away. Q. Did you see this stuff run out from the flow tanks? A. I sure did. Q. Just a stream running out of the flow tanks? A. It is to-day, yes."

Witness further testified that the water from this creek before these freshets was fresh and was used for farm purposes.

Upon further examination Mr. Richter testifies in substance that in the second flood everything was oily, the wheat was oily, the ground was oily, just a wallow of oil, and he supposes it soaked away and evaporated. It does not show there now. He says his horses came in contact with the polluted waters of Bird's Nest creek because there was no place for them to go except to stand in it when it came up and ran around the barn, and also he would lead them to water; that he had to take them out, take them back off the farm. The oil was all over the land and the polluted water was all around in the lot and around the barn. There was considerable amount of it in the barn lot and also in the hog lot east of the barn Probably some of the pollution there yet. **Oil and corruption was all through the mud, it was all oiled, it would not do to turn the horses out there in the polluted mud, it would poison them, even in the barn lot.** The mud was mixed with **oil so that you could squeeze oil out of it.** This was there at the lot, probably 25 rods from the creek. There was oil scattered all over the ground. When the water went down the oil stayed there. It was distributed over the ground and in places when it would rain the scum of oil could be seen on the top of the water, even after the flood; when showers would come you could see the scum of oil. We had to turn the horses into it because they had to

be taken to water, and then later some of them were taken to the pasture a mile north and a quarter east This other place did not belong to the witness. Witness says that the horses were found swollen about the third day after the overflow. The sores came on the horses later. They did not develop at the beginning, but the sores kept coming on, probably started coming on them in five or six days. The first time this was noticed six of the horses were affected and had to be taken to the hospital. It was necessary to clean the oil off the horses. Sometimes it took a good while. and every time they were taken out the horses had to be cleaned. It was necessary to hire two hands to help take care of them and clean the horses Does not know how many men he hired, but generally kept one at a time. Witness says that he had no more land to farm after the flood. and that these extra men were engaged principally in taking care of the horses.

The foregoing is the substance of the testimony with the exception of such as may be hereinafter detailed in order to understand the facts with reference to some specific assignment of error. At the conclusion of the testimony and upon a demurrer thereto by defendants, plaintiff asked leave to amend his petition so as to set out that the allegation in the petition as to the ownership in the wheat should specify a one-half interest therein, and the allegation as to damage for loss of use of cows and chickens be stricken from the petition, which, being allowed, the defendants demurred to the petition as amended and particularly as to the first and fifth causes of action dealing with lost wheat crops, which demurrers were overruled and exceptions saved. The defendants then demurred to the evidence and this demurrer was likewise overruled with exceptions. Defendants offered no testimony. The defendants then requested an instructed verdict for defendants as to each of the plaintiff's causes of action, which request was overruled. Thereupon they requested instructions Nos. 12 and 13, which are as follows:

"No. 12. You are instructed that it was the duty of the plaintiff to make all reasonable exertions to render the damages suffered by him, if you find he suffered any, as light as possible. In no case can a person recover for damages to his property which he knowingly permits to go on without making every reasonable effort, and taking active steps to lessen or prevent. If you believe from the evidence in this case that the plaintiff could have prevented or lessened the loss or damage, if any, suffered by him,

by taking proper and reasonable precautions so to do, but failed so to do, then none of the defendants can be held liable for any damage or item which the plaintiff could have so prevented."

"No. 13. The court instructed the jury that it is the duty of one whose property is injured. or about to be injured, by the wrong of another, to exercise reasonable diligence to avoid or minimize the resulting injury, and that if he fails to do so he cannot recover for any damage which he could by the exercise of reasonable care have avoided. Therefore, the court instructs the jury that it was the duty of the plaintiff, Richter, after discovering that his stock was being injured by said water and that the water in Bird's Nest creek was being polluted by the oil and gas operations of the defendants. if you find from the evidence that said water was being so polluted by the defendants. to exercise reasonable care to protect himself and his stock from injury therefrom.; that is to say, it was his duty to take such steps as a reasonably prudent person would have taken under the circumstances to protect his property from injury; you are instructed that if there were things he could have done by the exercise of reasonable care and at comparatively moderate expense to have avoided further injury to his property, and if he failed to do such things, that he cannot recover herein from the defendants any damages, which accrued to him and which he might have avoided by doing said things."

The court gave instructions Nos. 9 and 14 as follows:

"No. 9. You are instructed that it is the duty of a person seeing himself damaged or about to be damaged to use all reasonable efforts to prevent or minimize those damages, and therefore you may consider all the circumstances detailed to you in evidence in this case in determining whether, under the circumstances. in the case. it was the duty of the plaintiff to take any action he did not take to minimize or reduce his damages; and you may consider this in determining the damages, if any, to which you find the plaintiff entitled."

"No. 14. If you find from the evidence and under these instructions of the court, that the plaintiff is entitled to recover anything for the loss of any wheat growing then the measure of such damage would be the value of such wheat. at the time and place of injury or destruction, and in the condition it was when destroyed—but in this connection you are again reminded that the plaintiff is now asking for damages to one-half of the wheat injured or destroyed, as he only owned one-half thereof.

"If you find that the plaintiff is entitled to recover anything for injury to hogs, the measure of such damage would be the difference, if any, between the fair market value of such hogs after the injuries and on Au-

gust 25, 1923, and the market value of such hogs would have had at that time had they not been so injured.

"If you find from the evidence that the plaintiff is entitled to recover anything for the loss of one or more horses, then the measure of such damage would be the fair market value of such horses at the time of their loss, and the measure of damage for any injury to horses would be the difference between the fair market value of such horses after the injuries and before the injuries.

"If you find that the plaintiff is entitled to recover anything for damage to his pasture, then the measure would be the fair usable value of any lost pasture from April 1, 1923, to August 25, 1923.

"If you find that the plaintiff is entitled to recover anything for loss of time, and for inconvenience in caring for his live stock under the circumstances detailed by the evidence, then you may allow such sum for that as you find will justly compensate him for any loss of time or extra labor or inconvenience resulting directly from any wrongful acts of the defendants."

There was a verdict and judgment for the plaintiff. The defendants filed a motion for new trial based upon 11 grounds. Their assignment of error contains ten counts. Their brief and argument, however, are confined to four propositions, which will be discussed in order. Their first proposition is as follows:

"1. Where two parties have a joint interest in property, they must join in an action for injuries to such property and where in case one of the joint owners refuses to give his consent to the action he may be made a defendant."

This exception is based upon the proposition that the testimony showed that Blubaugh had a one-half interest in the wheat, and therefore that he was a necessary party plaintiff. The arrangement between Richter and Blubaugh may be understood from the following testimony by plaintiff:

"Mr. Blubaugh was not living on the farm in August, 1923; was on there a part of the time in April, 1923. The two of us put in the wheat. He was supposed to get one-half of the wheat. I paid for the seed. Blubaugh had four horses and I had 27. We had the understanding that Blubaugh was to use my horses in putting in the wheat and he did use the horses on the farm. There was no partnership agreement. He was to have one-half of the wheat on the home place and the school lease. He kept his horses in the barn.

"Q. Then the pasture was part his? A. I was reserving the right to keep my horses on there, he only got half of the wheat,

there was no rent on that, there was no renting."

"He could turn his stock out if he wanted to but he kept them in the barn I had no written contract with Blubaugh. I think it was in 1921 we had the arrangement to plant the 1922 crop that was killed in 1923. He was to get one-half of the wheat. I lived on the farm in 1921, 1922 and 1923.

"Q. When was the arrangement made between you and Blubaugh by which he was to receive half of the 1923 wheat crop, being the crop that was planted in 1922? A. That was arranged in 1921. Q What was that agreement? A. He got his pay in wheat instead of money. Q. Now, you are still stating conclusions; tell the conversation as near as you can between you and Blubaugh? A. Well, I wouldn't rent the land to him so he got his pay for the wheat, half of the crop. Q. I didn't get your last statement? A I wouldn't rent the land to him, but he got half of the crop. The Court: What was he to receive half of the wheat crop for? A. For farming it: for farm work. Q. What was he doing in return for it? A. Putting the crop in, helping. Q. What crop? A. The 1923 crop. Q. Wheat crop? A. Wheat crop. * * * Q. Then, isn't it a fact, Mr. Richter, that he rented that pasture land and you reserved the right to put your stock in there? A. No sir, he didn't rent it. * * * Q. If it is necessary to intelligently arrive at what was done in 1923 you may do so, but if there is no connection between 1921 and 1923, it will be unnecessary to, but if according to the agreement they are so interwoven that it is necessary, you may begin at the beginning. A. Well, I don't think we had a further agreement; right in the spring of 1923 he told me he was going to quit working; it didn't agree with him, he was told, to work on the farm; I told him I would pay him as good wages as he could get anywhere. He said, 'Well, I will work for you,' so there was nothing more said, he couldn't commence till Monday and on Monday noon is when he commenced; there was nothing said as to the wage I was to pay him, I think he worked for me from March to sometime in June, if I recollect. I couldn't recollect the dates, and when we went to settle I paid him $100 a month all during harvest. I was paying the harvest wage, I didn't stop at that, I paid him straight on, $100, and this additional harvest wage. That fall I told him I wanted him back. I wasn't able to take charge of everything he said he would just as leave live down there and I told him I couldn't rent the land. I wouldn't rent it to him, but just the same as I was paying him in wheat instead of paying him in money I would pay him in wheat which would be whatever we raised, if we raised good crops he got paid, if we didn't, he wouldn't, I would pay him in wheat, he got half of the crop and that appears to be the whole agreement; of course,

he wanted the money: he was in the house; and the misunderstanding, I thought I told the attorney this— Blubaugh stayed there until the 25th of July, 1923; that is the only arrangement I ever had with him; that was in effect up to July, 1923."

It will be observed that the defendants offered no evidence, and this evidence, as against a demurrer and as against a motion to direct a verdict, will be construed liberally in behalf of plaintiff. If there is any evidence reasonably tending to support the verdict, it being an issue at law, the verdict and judgment will be sustained. What, then, was the relation between Blubaugh and Richter? Was he a tenant? If so, he had an estate in the land. He had the control of it. Presumably he had the right to the full possession of it, even to the exclusion, if need be, of the landlord. Richter said that he lived on the land, used his pastures, kept 27 head of horses there, and that he was to pay Blubaugh in wheat instead of in money for his services. If they got a good wheat crop he would be well paid, and if a poor crop was harvested, his wages would be proportionately smaller.

In the case of Moore et al. v. Linn et al., 19 Okla. 279, 91 Pac. 910, the second paragraph of the syllabus reads as follows:

"A cropper's contract, whereby one agrees to cultivate the land of another, and is to receive as compensation therefor a share of the crops grown, does not create the relation of landlord and tenant. Except where it is otherwise provided therein, such a contract grants possession of the land only as an incident to the work that is to be performed, and confers no general right of occupancy of and control over the land cultivated."

There was a written contract in the above case, providing that the parties of the second part should prepare and sow wheat on all the plowed ground located on the southeast quarter of the southeast quarter of section 34, township 6 north, range 17 west; that the said second parties were to furnish the seed, cut the same when ready and put it in shock, all free of expense to first party. That second parties were to have two-thirds and second party one-third of the wheat to be divided either in shock, stack, or when threshed. With respect to this contract the court says:

"The contract in question is not a lease of the land sowed to wheat. The contract nowhere provides that the possession of the land shall be in the appellees until the harvesting of the crop. The contract is simply an ordinary cropper's contract, which the courts have almost universally held does

not create the relation of landlord and tenant."

The case refers to volume 18 Am. & Eng. Enc. of Law, page 173, which says:

"The question whether an agreement constitutes a lease or an occupancy on shares has chiefly arisen in the case of agreements relating to farming lands, whereby one party agrees to cultivate the land and is to receive as compensation therefor a share of the crops grown. Under such an agreement the relation of the parties is not that of landlord and tenant." (Citing a long list of cases from Alabama, Arizona, Arkansas, Connecticut, Delaware, Georgia, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, and other states).

"Before the division of the crop the whole is the property of the landlord, and the cropper has no legal title to any part thereof." Gray v. Robinson, 4 Ariz. 24; Bourland v. McKnight, 79 Ark. 427, 96 S. W. 179; Wentworth v. Miller, 53 Cal. 9; Maltbie v. Olds, 88 Conn. 633, 92 Atl. 403; Goodson v. Watson. 125 Ga. 413, 54 S. E. 84; De Loach v. Delk, 119 Ga. 884, 47 S. E. 204; Robinson Seed Co. v. Hamilton, 87 Neb. 76, 127 N. E. 163; Neal v. Bellamy, 73 N. C. 384; McCormick v. Skies, 163 Pa. 590, 30 Alt. 195; Morgan v. Tims, 44 Tex. Civ. App. 308, 97 S. W. 832.

"The cropper is entitled to go upon the land for the purpose of producing, harvesting and dividing the crop, but when this is done his possessory right ceases. Before the division of the crop, the whole is the property of the landlord, and the cropper has no legal title to any part thereof. * * * But a cropper may not maintain trespass or ejectment against a third person for wrongful entry upon the premises." 17 C. J., pp. 382-3, citing Decker v. Decker, 17 Hun. (N. Y.) 13; Bradish v. Schenck, 8 Johns. (N. Y.) 151; Denton v. Strickland, 40 N. C. 61.

This doctrine is followed again in Oklahoma in Halsell v. First National Bank of Coweta, 109 Okla. 220, 235 Pac. 532, which holds:

"The difference between a cropper and a tenant is that the cropper is a hired hand paid for his labor with a share of the crop he works to make and harvest. He has no exclusive right to possession and no estate in the land nor in the crop till the landowner assigns him a share. The tenant has exclusive right to possession of the lands he cultivates and an estate in the same for the term of his contract, and consequently he has a right of property in the crop."

In this case, Martin, who was making a crop on shares. mortgaged his interest to the bank and failed to gather the crop. The bank sued the landowner. The court said if Martin was a cropper a verdict should have been instructed for the defendant, but that since he had the exclusive possession and management of the farm, under no direction from the landlord, the relation of landlord and tenant existed, and Martin had the right to mortgage his interest. This in effect is the exact question at issue in the instant case, and passed upon adversely to the defendants.

We therefore conclude that, under these authorities Richter could have recovered in this case for the loss of the entire crop, and since he has reduced by amendment to his petition his claim to one-half the crop, we hardly think defendants are in a good position to complain.

In the case of Black v. Donelson, 79 Okla. 299, 193 Pac. 424, the court said:

"A defendant's right is to have a cause of action prosecuted against him by the real party in interest, but his concern ends when a judgment for or against the nominal plaintiff would protect him from any action upon the same demand by another, and when, as against the nominal plaintiff, he may assert all defenses and counterclaims available to him, were the claim prosecuted by the real owner (quoting Words and Phrases, 2nd Series, Real Party in Interest)."

"The purpose of the statute in requiring that the real parties in interest shall be made parties is in order that the decree rendered shall conclude all parties." Black v. Donelson, supra.

The court in the last cited case quotes from Words and Phrases, 2nd Series, vol. 4, page 132, as follows:

"The test of whether one is the real party in suit is, Does he satisfy the call for the person who has the right to control and receive the fruits of the litigation? * * *"

In the case of Atkeson v. Sovereign Camp W. O. W. et al., 90 Okla. 154, 216 Pac. 647, Judge Kennamer, speaking for the court, says:

"Section 224, Comp. Stats. 1921, reads as follows: 'The court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in.' Apparently, it was intended to remedy such a situation here existing; and it was held in the case of Simpson et al. v. Hillis. 30 Okla. 51, 120 Pac. 572, construing this section, that the court, by virtue of the authority given it hereby, has the power and is obliged, on its own motion, to call persons interested in the controversy,

and not legally made parties thereto, into court, and to adjudicate their rights without resorting to another action."

We take it, therefore, that the learned court that tried this case knew, as a matter of law, that the plaintiff had the legal right to sue for the damage to the entire crop under the authorities heretofore cited, and also knew that Blubaugh had no right to sue, and was, therefore, not a necessary party to the litigation. We assume that the court had in mind its duties under the section of the Code last quoted, making it mandatory upon him to call into the case those who had a legal interest in the controversy, and we must assume that he decided that Blubaugh was not such a party under the law and that all rights in the premises could be adjudicated between the parties to the litigation, and that in the light of this knowledge he proceeded to a final adjudication of this case.

"Substantial justice having been done by the verdict and judgment, and no prejudicial errors appearing in the instructions, the judgment will be affirmed." Ponca City Ice Co. v. Robertson, 67 Okla. 86, 169 Pac. 1111.

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." Muskogee Electric Traction Co. v. Ellison, 92 Okla. 200, 218 Pac. 829; Conservative Loan Co. v. Sarkey, 92 Okla. 257, 219 Pac. 107; Edwards et al. v. Negim & Co., 105 Okla. 7, 231 Pac. 488.

"Although there may be some technicality or immaterial errors committed in the trial of the case, if upon the whole record it is apparent that a correct conclusion was reached and a just judgment rendered, the judgment will not be disturbed." Edwards et al. v. Negim & Co., supra.

"An assignment of error that fails to show any resulting injury to plaintiff, or that any of his constitutional or statutory rights were violated, is not sufficient to work a reversal of the judgment." Curtin v. Moroney et al., 117 Okla. 276, 246 Pac. 232.

"Where the right of plaintiff to recover, on the undisputed facts, is so apparent that the errors assigned, if sustained, could not have resulted in a miscarriage of justice, the judgment will be affirmed." Westlake v. Cole, 115 Okla. 109, 241 Pac. 809; Purdy v. Mil'er Hunter Co., 94 Okla. 209, 221 Pac. 490.

Upon the oral argument of this cause, it was stated and accepted as a fact, that no suit had been brought against the defendants by Blubaugh on this cause of action.

This flood and the injury claimed by plaintiff occurred in the spring of 1923. Any cause of action that Blubaugh might have claimed, therefore, is long since barred. What, then, could be the profit, even if we should admit the court erred in not compelling the bringing in of Blubaugh as a party? If the authorities quoted first under this head are the law, Blubaugh could not have asserted any right against the defendants, and plaintiff could have recovered the entire damage; but out of abundant caution plaintiff's counsel chose to reduce his demand to one-half with respect to the larger items. We are of the opinion that the plaintiff is the only one who should be allowed to complain, and since he is content, we hold that the defendants have in no wise been harmed.

Since litigation is only a means to an end, who could be benefited by reversing this case and having another party made plaintiff or defendant, against whose claims there could be urged immediately and successfully a demurrer? And also another complete defense, to wit, the statute of limitations, even if we should assume that he had sufficient interest in the crop to enable him to bring a suit for the destruction thereof.

The second point urged by plaintiffs in error is, that the trial court should have sustained a demurrer to the evidence offered as to damage to plaintiff's wheat crop. We have examined carefully this evidence, and we must hold that it was sufficient not only to warrant the submission of the issue to the jury, but also to sustain their finding thereon in favor of the plaintiff. The testimony was somewhat conflicting as to the time the flood waters were on the wheat land. The plaintiff while testifying in his own behalf testified in substance as follows: That the depth of the water over the wheat varied, and that the time the flood water remained in the wheat also varied, but that the depth on a great deal of it was perhaps from four to six inches, and that the flood waters remained on the wheat from an hour or so to perhaps a day or a day and a half; that the water did not get over the top of the wheat; that the water was oily, and that the wheat began to turn white while the water was on it; and the witness says, that by turning white he meant that it died. He says also that he noticed oil practically all over the wheat after the waters went down. This was repeated in varying forms. He also says that the grain over which the water stood did not develop at all, and that he received no income from it whatsoever.

Mr. Hackney testified that he had observed the effect of salt water and other deleterious substances coming from Bird's Nest creek (and that this creek flowed through his farm) upon vegetation, and says it killed it; and further that he has observed other freshets in the same creek and before the bringing in of oil on the drainage basin, and when the water passed over the wheat it injured it only to a very small degree. The defendants, by their examination of Mr. Richter, announced that they would show that plaintiff's wheat was killed the year before by a flood in this creek and before the discovery of oil. They proceeded far enough to show that there was a flood in the creek the year before, but went no further. Plaintiff and another witness testified positively that salt water and oil killed his wheat. . . . ,

If this evidence is to be believed, and the statements of defendants' counsel in his opening address are to be considered, the production of oil and gas and salt water in this drainage basin was enormous; a good many wells produced thousands of barrels per day and came in as gushers. The evidence shows that immense quantities of these products, salt water, crude oil and base sediment, came down on this flood; that it covered the whole land and the crops thereon, and remained thereon after the waters subsided to such an extent that oil could be squeezed out of the mud in and around the barnyard of the plaintiff and on his farm many rods distant from this stream, and that it was so strong that horses, not in the flood itself, but being led to water through the sediment and slush left on the farm after the passing of the water, were poisoned, their hair came off, their legs became swollen, developed running sores, and some of them died.

The members of this court are not expert farmers, have had little experience with salt water, crude oil and base sediment, in so far as it affects growing crops. These witnesses have been farmers all their lives and accustomed to raising wheat, and have seen and observed the effects of both fresh water, and later what they called the polluted water which flowed down Bird's Nest creek. All this evidence is uncontradicted, and must be construed favorably to plaintiff. Good et al. v. First Nat. Bank of Roff, 88 Okla. 110, 211 Pac. 1051. We must, therefore, hold that the evidence was sufficient.

The third point argued by plaintiffs in error is that instruction No. 14, which permitted the jury to pass upon damage to plaintiff's hogs, was erroneous, since there was no competent evidence to show that the acts of defendants injured said hogs. Plaintiff testified that he had some pigs in the spring of 1923, 17 in number, a month and a half old; that these pigs had access to the waters of Bird's Nest creek, which was the water supply of the farm and of the live stock. Plaintiff further testified that he took good care of these pigs; that they were properly housed, and were kept on full feed from the time they were able to eat. Plaintiff says that he has been handling hogs all his life and that he gave good care to these pigs, and that after this flood the hogs did not thrive, and that they weighed only 40 pounds apiece August 25, 1923, and that they should have weighed on that date, under the care which had been given them, 140 pounds, and that the fair reasonable market value of these hogs on August 25, 1923, was 8 cents per pound. This evidence partakes of the nature of expert testimony—the statements of one who had raised hogs all his life— and there was no objection to this testimony upon any ground. We assume that men who have raised hogs for years are able, within reasonable bounds, to estimate closely what animals should normally weigh under given care and treatment. We must consider, also, in this connection, the damage to the horses, arising under the evidence, from the same cause, and we must take into consideration that the ground over which these pigs ranged was so saturated with salt water, base sediment and oil, that these substances could be squeezed from the dirt, and that for weeks and months afterwards the oil scum could be seen and would appear on the surface, and especially after rains. Such conditions could easily and logically account for the lack of development in these hogs, and the evidence in our opinion was sufficient to be submitted.

The fourth point urged is that the defendants' requested instruction No. 12 should have been given, and error in giving instruction No. 9. The main objection to No. 9 seems to be that the court told the jury that they might consider, in determining the damage, if any, to which the plaintiff would be entitled, whether or not the plaintiff omitted to take any action to reduce his own damage, but did not tell them pointedly that if they found that some of the damage to plaintiff was due to his lack of attention, he could not recover for any damage, which, with reasonable care, he could have prevented. These jurors are presumed to have been men of intelligence, and we think could not have misunderstood the purpose of the court in saying that in determining the damages

they should take into consideration the conduct of the plaintiff with respect to his duty to reduce or minimize his damages, and the same instruction in terms uses the following words:

"You are instructed that it is the duty of a person seeing himself damaged, or about to be damaged, to use all reasonable efforts to prevent or minimize those damages."

In this connection, there is pointed out in the pleadings of defendants no act of delinquency on the part of plaintiff, and there is in the proof, when considered favorably to plaintiff, as we are obliged to consider it on demurrer or upon motion to direct, no evidence that the plaintiff failed or omitted to properly care for his animals. The fact is, he carried a great deal of his stock even away from his own farm and hired hands to keep them in the barn, and lead them to water and scour the poisonous substances off of them. We are not impressed with this contention. We might go even a step further if it were necessary. Here the defendants are shown under all this evidence to have been acting in open violation of positive statutes with reference to the pollution of streams. (Sections 6526 and 7909, C. O. S. 1921). By their criminal act this plaintiff was almost driven from his home, his crops were destroyed, his animals poisoned, and his premises made unclean and unwholesome. We doubt, under such circumstances, whether the defendants were legally entitled to claim negligence or want of ordinary care on the part of plaintiff, so long as he acted in good faith. If the evidence is to be believed, defendants' conduct amounted to a crime, and the effect of it, with respect to plaintiff, constituted a continuing nuisance and trespass. Shannon v. McNabb, 29 Okla. 829, 120 Pac. 268.

We have examined this entire testimony, the record, the charge of the court, the pleadings and contentions of the parties, and we are of the opinion that the defendants have suffered no wrong in the trial or disposition of this case, and the verdict of the jury and the judgment of the court thereon should be and the same are affirmed.

TEEHEE, REID, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 17 C. J. p. 382, §11; 36 C. J. p. 683, §1913; p. 684, §1914; p. 685, §1915; 8 R. C. L. p. 373: 2 R. C. L. Supp. p. 603; 4 R. C. L. Supp. p. 551; 5 R. C. L. Supp. p. 467; 6 R. C. L. Supp. p. 504. (2) 40 Cyc. p. 600 (Anno). (3) 40 Cyc. p. 601; 20 R. C. L. p. 172; 3 R. C. L. Supp. p. 1041; 5 R. C. L. Supp. p. 1085; 6 R. C. L. Supp. p. 1185. (4) 40 Cyc. pp. 600, 601.